Law Firm of
**Susan K. Marcus, LLC**
29 Broadway, Suite 1412, New York, NY 10006
T: 212-792-5131 ◆ F: 888-291-2078 ◆ E: susan@skmarcuslaw.com

September 15, 2020

Honorable Carol Bagley Amon
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn NY 11201

In re: *United States v. Brown*, 19-CR-00445

Dear Honorable Judge Amon:

This letter constitutes the sentencing submission on behalf of William Brown, whom I represent by CJA appointment in the above-entitled case. For the reasons set forth below, it is respectfully requested that Mr. Brown be sentenced to time served plus a period of supervised release.

The reasons supporting such a sentence, detailed below, are as follows:

(1) Analysis of the factors enumerated in 18 U.S.C. §3553(a)(1)-(7) establishes that a sentence other than that prescribed by the Sentencing Guidelines is "sufficient, but not greater than necessary" in this case in order to achieve the purposes of sentencing set forth in §3553(a)(2). In particular, the following factors are pertinent to the Court's consideration:

    a.  Mr. Brown's background and character;

    b.  Mr. Brown's exemplary time on pretrial release;

    c.  The nature of the offense conduct; and

    d.  The unnecessary risks prison poses to Mr. Brown's health, particularly during the COVID-19 crisis.

(2) A sentence of incarceration would not rehabilitate Mr. Brown under 18 U.S.C. § 3582(a); and is not necessary to achieve the sentencing goals under 3553(a)(2);

(3) Below Guidelines sentences are the norm in this District and appropriate in this case.

## I.    *Sentencing Factors Under 3553(a)*

William Brown's life has been defined by his desire to help others and his ability to persevere despite numerous setbacks in his life. As the oldest of three siblings, Mr. Brown has

always had the responsibility of being a caretaker. His family has had several financial, medical and psychological hardships in the last several years. His family relies on Mr. Brown significantly. Even though he is the son, he is considered the "patron" of the family. PSR ¶ 35. Caring for them is his primary responsibility. As a 34-year-old man, he has delayed having his own children so that he may remain available to his parents, siblings, cousins and aunts and uncles. Mr. Brown feels he let his family down by his conduct in this case, is deeply ashamed, and has spent the last year bettering himself to ensure that he does not make any other mistakes like this. A deeply spiritual man, he has used this conviction as an opportunity not to feel sorry for himself, but to recommit himself to an honorable life. Tragically, his pastor (who wrote a letter on Mr. Brown's behalf) passed away in the Spring from COVID-19. This was a devastating loss for Mr. Brown, but he has resolved to live his life worthy of his Pastor's grace and wisdom.

### a. *Mr. Brown's Background and Character*

Mr. Brown's grandparents immigrated to the United States from Antigua. His parents were born and raised in Queens, as was Mr. Brown and his siblings. His family often refers to him by his middle name, "Brian," as his father's name is also William. Mr. Brown's extended family is mostly in Queens, and family gatherings have been important throughout his life for forming close familial bonds. The commitment to family that Mr. Brown witnessed throughout his childhood shaped how important he considers his family to be now. Being able to provide for others is one of the reasons why Mr. Brown has worked so hard to pursue an education and to achieve success in his different professions.

At times, however, Mr. Brown has experienced significant hardships that have made it difficult for him to care for others or where his prioritization of his family and his friends has come at a notable personal and economic cost to himself. There have been multiple times throughout his life where he has experienced housing and financial insecurity. Several of his family members were diagnosed with debilitating or chronic illnesses, and Mr. Brown had to leave college to care for them. And lastly, when one of Mr. Brown's family members struggled financially, Mr. Brown gave them whatever money he could, not always appreciating how doing so would make it difficult for Mr. Brown to care for himself.

### Early Childhood

Mr. Brown was born on July 14, 1986 to William Brown, Sr. and Marsha Brown in Queens, NY. Mr. Brown has two younger siblings, Joanne and Derek, and the family spent most of their time in a neighborhood called Hollis. However, Mr. Brown's family moved around Queens several times as a child, and he has also lived in Lefrak City, St. Albans, and Laurelton. When Mr. Brown was born, the family lived in an apartment and then moved to a single-family home shortly afterwards. There was a period of time when they were stable. Mr. Brown's mother has worked for the postal service for more than 20 years, and his father worked for a trucking company but was laid off due to the impact of the financial crisis in the mid 2000s, ███████
████████████████████████████████████.

Mr. Brown's mother has a very large family, and several of her siblings had children around the same time that Mr. Brown was born. The family raised all the children together, and they spent a lot of time at cookouts and barbecues so that the children could grow up with a sense of community. Mr. Brown's parents, and particularly his mother, were also very religious, and Mr. Brown started going to church at a young age. Mr. Brown still attends church as an adult, and sought out the Mt. Zion Baptist Church. His faith has been critical to his development. At a young age, Mr. Brown learned that prayer can be used as a vehicle for asking God for wisdom and guidance, and this is a tradition that he continues to practice. Mr. Brown was very involved in the church as a child, and he attended bible school. When he became older, he went on retreats with his father and the church's "Men's Fellowship" organization. Mr. Brown's commitment to his faith models the behavior that he witnessed in his parents. Marsha Brown is a member of the Gospel Tabernacle Baptist Church where she used to teach church school, and her faith life has been so important to her that 10 years ago she underwent formal training in theology at the Bethel Bible Institute.

To know Mr. Brown's family is to know their commitment to religion. They believed that their behavior towards others was a measure of their faith, and that's why they always strived to help family members who were in need. During Mr. Brown's childhood, some of his aunts, uncles, and cousins had financial difficulties, and Mr. Brown's family invited them to live in their house. His family was not wealthy by any means, but family was always a priority for them, and they wanted to do everything that they could to help. This is the sense of dedication to family that Mr. Brown continues to carry with him to this day.

Although Mr. Brown grew up in a large and supportive community, his childhood also had several personal challenges. ███████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████

**Adolescence**

Mr. Brown attended IS 59 in Queens for middle school and the Humanities and the Arts/Campus Magnet High School.  Mr. Brown and his cousins were raised to believe that education is very important and that it is the vehicle for success in the future. Therefore, Mr. Brown was extremely involved in his high school and was an active member of many clubs and organizations. He was a leader in student government and was a member of Model United Nations, the drama team, and the bowling team. He also had an afterschool job at Pet Supplies Plus in Westhampton, NY. Most importantly, while managing all these different extracurricular activities, he maintained an acceptable grade point average and ranked in the top 50% of his high school class.  The work ethic that Mr. Brown possesses today was formed during his adolescence when he started working and balancing the demands of his education at the same time.

Although the neighborhood in which they were living wasn't notorious for being a territory occupied by gangs, there was some gang activity. Mr. Brown was harassed by members of a gang at school.  He had no desire to join them, and stayed away. Luckily other individuals in the school community who knew Mr. Brown, and knew he had no desire to be a part of that negative influence, instructed the gangs to leave him alone. Police were unfortunately not a source of support for Mr. Brown, as he and his friends were regularly harassed by police on their way to school. These experiences were very difficult for him, because he was a good kid who did not commit crimes or engage in bad behavior, yet he was stopped, searched, and questioned regularly. Mr. Brown's parents taught him the parameters of how he was supposed to interact with the police so that he would not get harmed.  He was taught to always look police officers in the eye, be respectful, answer questions honestly, and most importantly, he was taught to never run away. And although this information was helpful for surviving each incident where he was stopped by the police, these experiences also left a lasting impact on him. They made him feel less safe, and taught him to go ever more inward, rather than ask for their help.

**Adulthood**

Upon graduating from high school, Mr. Brown enrolled in South Carolina State University to study business and accounting.  He had received a small scholarship to attend the university, and he also enrolled in the National Guard which also helped to fund his education. Mr. Brown did not see active combat as part of his time in the National Guard, but he did assist with Hurricane Katrina relief in both Georgia and Alabama.  He was also in a fraternity called Persian Rifle, and by the time of his discharge from the National Guard, Mr. Brown had received the rank of Private First Class Specialist E4 (SPC-E4), since he had previously been promoted from levels E1-E3.

Although Mr. Brown enjoyed his time in South Carolina, it was also a very challenging experience for him because he had to balance his college coursework, his National Guard responsibilities, and the jobs that he procured to help supplement his income.  Mr. Brown worked at a McDonald's and a Hardy's when he was in South Carolina to help with living expenses that were not covered by his scholarships or loans.  And although he had this supplemental income, this was a time in Mr. Brown's life where he began to experience

significant financial hardship.  Mr. Brown was living with several classmates and friends and together they struggled to pay the rent and the utilities.  Mr. Brown and his friends moved several times because they couldn't afford to stay in the housing that they had rented, and there were months-long periods where they lived without electricity.  During this time, Mr. Brown was also known as a person who would loan money to friends in need or allow them to stay in his apartment free of charge.  However, there were other times when Mr. Brown was homeless because he had to stay with friends and didn't have a permanent place of his own.  This is truly indicative of how Mr. Brown's generosity knows no bounds because even when he was struggling to provide for himself, he always strove to take care of others who he felt were in a worse position than he was.

Unfortunately, a combination of financial pressures and family illnesses resulted in Mr. Brown not being able to complete his education at South Carolina State University.  His grades deteriorated throughout college. His financial hardships, described by his friend Willie Page, as well as his work, military and family demands, made him a much poorer student than he would have liked to be. During Mr. Brown's time in college, █████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████

When Mr. Brown moved back to New York, he also started working various jobs for neighbors and eventually procured a position as the crew chief of a Pizza Hut in Penn Station.  It was important for Mr. Brown to make money, not only to provide for himself, but also to take care of his family.  ██████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████. Mr. Brown continues to give them as much money as he can so that they can be financially stable.  He has paid utility bills for his cousins when they are struggling financially, and as a surprise wedding gift, he purchased his cousin's wedding gown for her when he knew that she didn't have a large budget for her wedding.

Since Mr. Brown started working, it was not uncommon for him to work multiple jobs at the same time. According to social security records, Mr. Brown was working multiple jobs in the late 2000s and early 2010s in order to support himself. However, when he was hired to work for Swissport at the airport, this was a job that gave him consistent financial security.  Mr. Brown also loved this job and was well respected by all his co-workers.  He initially started in the

training program at Swissport and was eventually promoted to a supervisor. Mr. Brown would often take extra shifts at the airport and work overtime because he wanted to make more money to help support his family. His father's illnesses were major motivators for how hard Mr. Brown was working to support his loved ones. However, for Mr. Brown, his job with Swissport was about more than the money. He also truly cared about his co-workers. ███████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ █████████

███████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████ However, through these challenges, Mr. Brown has continued to take care of the people in his life who he thinks need his support because his loved ones are his top priority.

### b. *Mr. Brown's Exemplary Time on Pretrial Release*

Mr. Brown has maintained consistent employment and has been fully compliant with the conditions of his release. He was understandably let go from his job at Swissport as a result of this case. He struggled to find meaningful employment initially. His first worry was how he was going to afford his rent, and continue to support his family, including his younger brother, who was living with and dependent on him. ████████████████████████████████████ ███████████████ He spent a significant amount of time with his Pastor at church, to come to terms with the terrible mistake he made. He sought to hold himself accountable for his poor choices in this case. He resolved to work harder, and start over.

In my 25 years of doing criminal defense work, I have never had a client as hard-working or selfless as Mr. Brown. His resilience and dedication have been an inspiration not just to his family and friends, but to me as well. As I learned about all of the responsibilities he shouldered, I was moved by his compassion for others, and his resolve to keep moving forward, despite significant obstacles. He showed up for every meeting in a three-piece suit, sweating from having run from one obligation to the next. I have never seen bitterness or resentment, just worry, and fear, about what will happen to his family if he falters.

Upon his release, Mr. Brown got right to work finding new employment. The first job he was able to find was with Verizon selling telephone contracts to commercial businesses. However, this job was based on commission, and the most he could make was $300/week. PSR ¶ 47. He then found work at Amazon and Fresh Direct, where he earned minimum wage. He continued to search for more work, and obtained a part-time contract with Roadside Express in Long Island, working as a roadside assistance technician. Then, in January, Mr. Brown found employment cleaning garbage compactors and garbage chutes for Chuteplus Cleaning. He has worked there full-time since then (while also still working as a roadside assistance technician).

He thankfully did not lose his jobs during the COVID-19 pandemic, and has worked his way up to be a team leader at Chuteplus Cleaning. A month ago, he secured a third job working the overnight shift at Home Depot. After just 30 days there, they have asked him to start management training.

Mr. Brown's work ethic and continued commitment to family have helped him weather the storm of his poor choices. He continues to be a source of great material, physical, and emotional support to his ailing family. Just yesterday he spent six hours helping his mother and father with their appointments and daily needs. This morning, before he went to work, he spent several hours helping his mother sort out technical problems with her phone. His friends universally voice appreciation for his generosity – both materially and spiritually. He has used this experience to recommit himself to an exemplary life.

### c. *Offense Conduct*

This is the only case for which Mr. Brown has a criminal record (the prior case mentioned in his PSR was in fact dismissed). The pressures of having so many people depend on him, and the cascading setbacks in his family converging at the same time, led Mr. Brown to make an ill-advised decision to agree to look out for a bag coming off of a plane. He had considered his codefendant a friend. He had been working a tremendous amount of overtime the year before—his social security earnings records show that he was able to double his salary in 2018. *See* Social Security Earnings [Attached]. Yet his family's need was so great at that time, he gave in to the temptation to make extra money. It was a devastating decision with long-term consequences, but one that is an aberration. I hope the Court will give Mr. Brown a second chance and allow him to remain in the community so that he may continue to be the support that his family needs.

Mr. Brown was not the person who had the drug connection. He did not set up the deal, plan to have anything to do with selling the drugs, or even know what was in the bag, let alone the amount or type of drug. In his case, his Guideline calculation is entirely determined by the quantity and type of drug, factors that were outside his knowledge. His part in the conspiracy was minimal; he was told to simply signal to his codefendant when a certain bag came through. While he faces a criminal conviction for his role in agreeing to have any part in this conspiracy, the amount of months he is facing overstate his criminal culpability. The Guidelines do not make a meaningful distinction between levels of culpability. Under the Guidelines, Mr. Brown faces the same amount of time he would face if he were the person who organized, planned and financially benefitted significantly from the illegal activity. But the nature of the offense in Mr. Brown's specific case mitigate in favor of a non-incarceratory sentence.

Indeed, drug-trafficking Guidelines ranges have been criticized for not being based on empirical data, the expertise of the United States Sentencing Commission (hereinafter the "USSC"), or the actual culpability of defendants.[1] Years after *Booker*, the USSC estimated that the most culpable drug traffickers, including high-level suppliers and importers, and managers

---

[1] *See, e.g.*, Memorandum Explaining a Policy Disagreement with the Drug Trafficking Offense Guideline at 2, *United States v. Diaz*, No. 11-CR-00821-2 (JG), 2013 WL 322243, at *9, *18 (E.D.N.Y. Jan. 28, 2013) (Gleeson, J.).

and supervisors accounted for only 10.9% and 1.1% of drug cases, respectively.[2] Judge Gleeson similarly recognized that "only 6% of drug-trafficking defendants could be classified as managers or leaders, *i.e.* individuals occupying the highest rungs of a drug enterprise." *United States v. Leitch*, No. 11-CR-00609 (JG), 2013 WL 753445, at *11 (E.D.N.Y. Feb. 28, 2013) (Gleeson, J.). Instead, since the Guidelines went into effect, federal prisons have been increasingly populated with underlings: couriers, mules, street-level dealers, and others. The sentencing table, however, was created with high-level kingpins in mind, based on the USSC's assumed link between drug quantity and culpability.[3] The result is that applying the Guidelines leads to extremely harsh and inconsistent sentencings for drug enterprise underlings. In other words, the Guidelines fail dramatically where drug-quantity-based calculations impose kingpin culpability levels on low-level actors such as couriers and street-level dealers. Quantity-based sentencing was based on mistaken Congressional assumptions that lengthy sentences would reach high-level drug traffickers.

█████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████

### d. Prison Unnecessarily Risks Mr. Brown's Health During the COVID Crisis

Since Mr. Brown was released on bond one year ago, in September 2019, the world has seemingly been turned upside down by the wholly unexpected and unprecedented global COVID-19 pandemic. As of last month, six months into the pandemic in the U.S., new COVID-19 cases were increasing or mostly the same—but not decreasing—in most states around the country,[4] with public health officials and authorities "concerned about a possible fall resurgence in cases amid the start of the flu season, which will likely exacerbate efforts to treat the

---

[2] U.S. SENTENCING COMM'N, REPORT TO CONGRESS: MANDATORY MINIMUM PENALTIES IN THE FEDERAL CRIMINAL JUSTICE SYSTEM 167 (2011) (hereinafter the "Mandatory Minimum Report"), https://perma.cc/5EK6-PBXV. Moreover, the Mandatory Minimum Report indicates that "[a]mong those offenders who received relief from the mandatory minimum penalty by providing substantial assistance to the government, the Commission's analysis shows that offenders who performed high-level functions generally obtained relief for substantial assistance at higher rates than offenders who performed low-level functions." *Id.* at 171.

[3] The first sentencing table was actually set above the mandatory minimum to enable prosecutors to leverage sentencing reductions in exchange for defendants' guilty pleas and cooperation. *See* Patti B. Saris, *A Generational Shift for Federal Drug Sentences*, 52 AM. CRIM. L. REV. 1, 6 (2015) (citing U.S. SENTENCING COMM'N, REPORT TO THE CONGRESS: COCAINE AND FEDERAL SENTENCING POLICY 5–6 (2002)). "The apparent intent of the [mandatory minimum legislation] was to increase sentences on *major* drug offenders. As Senator Robert Byrd stated: [¶] [A major drug offender] must know that there will be no escape hatch through which he can avoid a term of years in the penitentiary. . . . We divide these major drug dealers into two groups for purposes of fixing what their required jail terms shall be: For the kingpins—the masterminds who are really running these operations—and they can be identified by the amount of drugs with which they are involved—we require a jail term upon conviction. If it is their first conviction, the minimum is 10 years. . . . Our proposal would also provide mandatory minimum penalties for the middle-level dealers as well. Those criminals would also have to serve time in jail . . . a minimum of 5 years for the first offense." Barbara Meierhoefer, *The Severity of Drug Sentences: A Result of Purpose or Chance?*, 12 FED. SENTENCING REP. 34, 34 (1999) (quoting 132 CONG. REC. § 14301 (daily ed. Sept. 30, 1986) (statement of Sen. Byrd)).

[4] *See* https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

coronavirus."[5] As of this week, new cases are higher or going up in at least 22 states, and new deaths are increasing in roughly a dozen states.[6] 10 of the top 10 COVID-19 hotspots in the U.S., and 85 of the top 100, are prisons and jails.[7] The federal BOP system, "America's largest network of prisons and jails," is particularly vulnerable to the spread of infection as prisoners continue to be transferred across state lines, to and from far-flung locales around the country, including in and out of the New York area.[8]

Indeed, of the 12 Federal Correctional Institutions in the BOP's Northeast Region, at least *seven* have experienced COVID-19 outbreaks, most notably the well-publicized and lethal outbreak at FCI Elkton in Ohio. Nearly 1,000 prisoners at FCI Elkton (more than half of the prisoner population there) have tested positive, and nine have died due to COVID-19.[9] The outbreak at FCI Danbury in Connecticut has also been lethal, with one prisoner death due to the virus.[10] 87 prisoners and 64 staff have tested positive at FCI Danbury.[11] The other FCI's in the region with COVID-19 outbreaks include FCI Otisville in New York,[12] "quarantine site" FCI

[5] https://www.usnews.com/news/top-news/articles/2020-08-16/us-coronavirus-death-toll-hits-170-000-ahead-of-fall-flu-season.

[6] *See* https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

[7] *See* https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

[8] *See* Keegan Hamilton & Keri Blakinger, *'Con Air' Is Spreading COVID-19 All Over the Federal Prison System*, The Marshall Project (Aug. 13, 2020), available at https://www.themarshallproject.org/2020/08/13/con-air-is-spreading-covid-19-all-over-the-federal-prison-system ("[P]artly due to federal courts and law enforcement agencies pumping thousands of new people into the system" throughout the pandemic, COVID-19 has "wreak[ed] havoc across the Bureau of Prisons, killing 111 prisoners and at least one staff member, and infecting over 10,000 prisoners and 1,200 workers in America's largest network of prisons and jails. . . . As of early August, nearly 3,500 people in Marshals custody had tested positive for COVID-19, and 13 had died.").

[9] *See* Keri Blakinger & Keegan Hamilton, "I Begged Them To Let Me Die": How Federal Prisons Became Coronavirus Death Traps, The Marshall Project (June 18, 2020), available at https://www.themarshallproject.org/2020/06/18/i-begged-them-to-let-me-die-how-federal-prisons-became-coronavirus-death-traps. As of September 15, 2020, the BOP reports these current numbers for FCI Elkton: 5 inmates positive, 2 staff positive, 9 inmate deaths, 960 inmates recovered, and 52 staff recovered. https://www.bop.gov/coronavirus/. It is important to remember that the BOP's reported positive test numbers do not reflect the actual number of inmates and staff at each facility that have been, and/or currently are, infected with COVID-19. At many of its facilities, the BOP has only tested a small percentage of inmates and staff, based on its own, sometimes seemingly arbitrary, criteria for when testing of an individual is warranted. When the BOP finally got around to increasing its testing capabilities months into the pandemic, the results revealed that more than 35% of tested federal prisoners were positive for the virus. *See* Luke Barr, More than 1 out of 3 tested federal inmates were positive for coronavirus, ABC News (June 16, 2020), available at https://abcnews.go.com/Politics/tested-federal-inmates-positive-coronavirus/story?id=71275461 ("The [BOP] says that of its 16,839 tested inmates, 6,060 have tested positive. In total, the BOP has tested more than 18,000 of its 163,441 federal inmates, with results pending in more than 2,300 cases.").

[10] *See* Edmund H. Mahony, Danbury prison inmates settle with Bureau of Prisons in suit over COVID threat, Hartford Courant (July 27, 2020), available at https://www.courant.com/coronavirus/hc-news-coronavirus-danbury-prison-covid-settlement-20200727-20200727-lsvka64asbf53do6raygr2j7vm-story.html ("The inmates sued in late April when corona virus transmissions were at crisis levels in the northeast and Danbury was among the hardest hit in the Federal Bureau of Prison system. By early May, about 60 inmates and 50 staff members had contracted the disease and one inmate has died.").

[11] As of September 15, 2020, the BOP reports these current numbers for FCI Danbury: 2 inmates positive, 1 inmate death, 85 inmates recovered, and 64 staff recovered. https://www.bop.gov/coronavirus/. *Id.*

[12] Liliana Segura, As Virus Spreads in Federal Prisons, People Inside Describe Chaos, While Families Are Left In The Dark, The Intercept (Apr. 15, 2020), available at https://theintercept.com/2020/04/15/federal-prisons-coronavirus/ ("The attempts at social distancing [at FCI Otisville] were futile. In the medium-security facility

Ray Brook in New York,[13] FCI Fort Dix in New Jersey,[14] FCI Fairton in New Jersey,[15] and FCI Loretto in Pennsylvania.[16] Further, the one Federal Medical Center in the BOP's Northeast Region, FMC Devens, has experienced a lethal outbreak of COVID-19 resulting in the deaths of two prisoners at the facility.[17]

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

where Carrillo was housed, men were double-bunked, with more than 100 people per unit."). As of September 15, 2020, the BOP reports these current numbers for FCI Otisville: 1 staff positive, 28 inmates recovered, and 14 staff recovered. https://www.bop.gov/coronavirus/.

[13] *See* Harry August & Alex Garnick, "The Situation Here Is Dire": How an Upstate New York Prison Failed to Contain a COVID-19 Outbreak, The Marshall Project (Apr. 16, 2020), available at https://theappeal.org/coronavirus-upstate-new-york-prison-failed-to-contain-outbreak/ ("FCI Ray Brook was slow to respond to the spread of coronavirus among correctional officers. Now the outbreak has reached prisoners."); Aaron Cerbone, Five new COVID-19 cases reported at federal prison in Ray Brook, The Post Star (June 23, 2020), available at https://poststar.com/news/state-and-regional/five-new-covid-19-cases-reported-at-federal-prison-in-ray-brook/article_e23008b2-f218-504c-a4da-85a2cf0688c2.html ("Corrections officer union leaders said delayed action from the BOP caused this spread, which landed one CO in the hospital on a ventilator for 21 days. In May, the BOP announced plans to move thousands of new U.S. Marshals Service inmates to quarantine sites at federal prisons around the country — including FCI Ray Brook."). As of September 15, 2020, the BOP reports these current numbers for FCI Ray Brook: 15 inmates recovered, and 10 staff recovered. https://www.bop.gov/coronavirus/.

[14] *See* Colleen O'Dea, COVID-19 Horror Stories Prompt ACLU-NJ to File for Temporary Release of Medically Fragile Prisoners, NJ Spotlight (May 6, 2020), available at https://www.njspotlight.com/2020/05/covid-19-horror-stories-prompt-aclu-nj-to-file-for-temporary-release-of-medically-fragile-prisoners/ ("At federal facility at Fort Dix, social distancing is impossible, masks are in scant supply and visibly ill prisoners continue to work — while 40 inmates and three staff have tested positive for COVID-19"). As of September 15, 2020, the BOP reports these current numbers for FCI Fort Dix: 36 inmates recovered, and 6 staff recovered. https://www.bop.gov/coronavirus/.

[15] As of September 15, 2020, the BOP reports these current numbers for FCI Fairton: 4 inmates positive, 3 staff positive, 99 inmates recovered, and 7 staff recovered. https://www.bop.gov/coronavirus/.

[16] *See* Randy Griffith, Loretto federal prison sees outbreak spike as Cambria County reports record 30 new COVID-19 cases, The Tribune-Democrat (Aug. 6, 2020), available at https://www.tribdem.com/coronavirus/loretto-federal-prison-sees-outbreak-spike-as-cambria-county-reports-record-30-new-covid-19/article_1d22ef5e-d736-11ea-b2c9-f7cb4e508a04.html ("An apparent outbreak at the federal prison in Loretto appears to have driven Cambria County's 30-case surge in COVID-19 cases as reported on Wednesday."); DOH: Outbreak at FCI Loretto contributes to surge in Cambria County's COVID-19 cases, WJAC (Aug. 6, 2020), available at https://wjactv.com/news/local/doh-outbreak-at-fci-loretto-contributed-to-surge-in-cambria-countys-covid-19-cases ("Pennsylvania's health department confirmed Thursday that a COVID-19 outbreak at Federal Correctional Institution Loretto has contributed to Cambria County's recent spike in cases. The Bureau of Prisons is reporting 40 inmate and seven staff cases at FCI Loretto, but the exact number of current cases isn't clear . . . ."). As of September 15, 2020, the BOP reports these current numbers for FCI Loretto: 7 staff positive, 58 inmates recovered, and 3 staff recovered. https://www.bop.gov/coronavirus/.

[17] *See* Joan Eliyesil, COVID-19 claims life at Devens prison, staff members test positive, The Harvard Press (May 14, 2020), available at https://harvardpress.com/News/News-Articles/ArtMID/4510/ArticleID/20936/COVID-19-claims-life-at-Devens-prison-staff160members-test-positive ("Because of the frailty of many inmates there, FMC Devens has recently come under fire for not following U.S. Attorney General William Barr's April 3 memo directing prisons to identify inmates with COVID-19 risk factors and consider releasing them to home confinement."); Brian Dowling, Mass. Federal Prison A COVID-19 "Powder Keg," Suit Claims, Law 360 (Apr. 15, 2020), available at https://www.law360.com/articles/1263888/mass-federal-prison-a-covid-19-powder-keg-suit-claims. As of September 15, 2020, the BOP reports these current numbers for FMC Devens: 1 inmate positive, 2 staff positive, 2 inmate deaths, 47 inmates recovered, and 6 staff recovered. https://www.bop.gov/coronavirus/.



Unsurprisingly, a growing number of prisoners in both state and federal facilities have

███████████████████████████████████████████████████
█████████████████████████ █ ███████████████████ ███████
█████████████████████████████████████████████ ████
█████████████████████████████████████████ ████
███████████████████████████████

Given his health history, in the time of COVID-19, Mr. Brown will face danger to his life from even a short period of incarceration, given the inherent overcrowding, poor infectious disease control practices, and inadequate medical care that persist throughout the BOP.[28] Being released on bond in September 2019 allowed Mr. Brown to not only work hard to regain a productive, honest life with which he contributes meaningfully to both his family and community at a time when such contribution is desperately needed; his release on bond also allowed him to stay healthy and safely avoid the scourge of COVID-19 in New York City, as he lives in a two-bedroom apartment with his brother, allowing for adequate social distancing and quarantining when needed. In turn, he has been able to remain the strong, dependable member of the family that his family is used to being able to rely on.

## II.     *Under 18 U.S.C. § 3582(a) A Prison Sentence Is Not Appropriate*

The Pre-Sentence Report ("PSR") calculates a total offense level of 21, and places Mr. Brown in Criminal History Category I. PSR, at 5-6. The corresponding Guidelines range would be 37 to 46 months' imprisonment.

However, as detailed below, that calculation, and both the offense level and Criminal History Category to which it rigidly hews, prescribe a sentence in excess of that "sufficient but not greater than necessary" to achieve the purposes of sentencing enumerated in 18 U.S.C. §3553(a)(2).

The PSR does not engage in the relevant considerations under §3553(a), leaving that calculation to the Court to arrive at a sentence "sufficient but not greater than necessary" to achieve the goals listed in §3553(a)(2). Indeed, in *Pepper v. United States*, 562 U.S. 476, 131 S. Ct. 1229 (2011), the Court *twice* emphasized that a sentencing judge assumes "an overarching duty under § 3553(a) to 'impose a sentence sufficient, but not greater than necessary' to comply with the sentencing purposes set forth in § 3553(a)(2)." *Id.*, at 491. *See also United States v. Dorvee*, 604 F.3d 84, 93 (2d Cir. 2010) ("[u]nder §3553(a)'s 'parsimony clause,' it is the sentencing court's duty to 'impose a sentence sufficient, but not greater than necessary to comply with the specific purposes set forth' at 18 U.S.C. §3553(a)(2)"), *quoting United States v. Samas,* 561 F.3d 108, 110 (2d Cir. 2009).

Indeed, any mention of §3553(a) in the PSR is a recitation of some facts, but not the qualitative, individualized analysis that post-*Booker* sentencing demands. As the Supreme Court

---

[27] *Diabetes behind bars: challenging inadequate care in prisons*, The Lancet Diabetes & Endocrinology (May 1, 2018), https://www.thelancet.com/journals/landia/article/PIIS2213-8587(18)30103-7/fulltext.

[28] *See, e.g.*, Decl. of Dr. Homer Venters, at 1, *Chunn v. Edge*, 20-cv-1590, ECF No. 72-1, at 1 (detailing MDC Brooklyn's "failure to implement simple procedures, in-line with the Center for Disease Control (the 'CDC') guidelines, that could identify patients ill with COVID-19, prevent the spread of COVID-19 throughout the facility, and ensure that high-risk patients receive adequate care.").

declared in *Nelson v. United States*, 550 U.S. 350 (2009), "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Id.*, at 351 (emphasis in original).[29]

18 U.S.C. §3582(a) requires a sentencing court to "recognize [that] imprisonment is not an appropriate means of promoting correction or rehabilitation." *See United States v. Rosado*, 254 F.Supp. 2d 316, 321 (S.D.N.Y. 2003) ("Since rehabilitation may not be a basis for incarceration but must be considered as a basis for sentencing, Congress must have anticipated that sentencing judges would use their authority, in appropriate cases, to reduce a defendant's sentence to permit him to continue his rehabilitation in the most effective manner.").

Not only does Mr. Brown not need a prison sentence to be rehabilitated, but there is a growing understanding that prison overcrowding, as a result of reflexively long Guidelines sentences, and especially in light of the COVID-19 pandemic, needs to be addressed. "Incarceration is a practice that has emerged in recent decades as a catch-all mechanism for managing social ills."[30] Ta-Nehisi Coates, author of *Between the World and Me*, wrote about the ineffectiveness of harsh sentences: "The hammer of criminal justice is the preferred tool of a society that has run out of ideas."[31]

*The New York Times* observed that "the depth of the crisis in the federal system alone has been clear for years. Harsh mandatory minimum sentencing laws have overstuffed prisons with tens of thousands of low-level, nonviolent drug offenders serving excessively long sentences. Federal prisons now hold more than 215,000 inmates, almost half of whom are in for drug crimes. Many come out more likely to reoffend than they were when they went in, because of the lack of any meaningful rehabilitation programs inside prison and the formidable obstacles to employment, housing and drug treatment that they face upon release."[32] The editorial also noted that "the Bureau of Prisons eats up nearly $7 billion a year, a quarter of the Justice Department's entire budget."[33]

This crisis in the federal prison system was particularly highlighted by the "reckoning" the COVID-19 pandemic forced upon overcrowded prisons and jails throughout the country this year.[34] History now shows the Federal Sentencing Guidelines have been a key ingredient in the rise of mass incarceration.

---

[29] While the Supreme Court's ruling in *Rita v. United States*, 551 U.S. 338 (2007), established that a within-Guidelines sentence can be presumptively reasonable, *id.* at 347, that presumption is restricted to appellate review and "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." *Id.* at 351 (*citing United States v. Booker*, 543 U.S. 220, 259-60 (2005)). *See also Nelson*, 550 U.S. at 351.
[30] Professor Sharon Dolovich, "Incarceration American-Style" (2009). Harvard Law & Policy Review, Vol. 3, p 237, 2009.
[31] Ta-Nehisi Coates, "Killing Dylan Roof." THE ATLANTIC, May 26, 2016, *available at:* http://www.theatlantic.com/politics/archive/2016/05/dylann-roof-death-penalty/484274/.
[32] The Editorial Board, *A Rare Opportunity on Criminal Justice*, The N.Y. Times (Mar. 15, 2014), https://www.nytimes.com/2014/03/16/opinion/sunday/a-rare-opportunity-on-criminal-justice.html.
[33] *Id.*
[34] *See, e.g.*, Dara Lind, *The Prison Was Built to Hold 1,500 Inmates. It Had Over 2,000 Coronavirus Cases*, ProPublica (June 18, 2020), https://www.propublica.org/article/the-prison-was-built-to-hold-1500-inmates-it-had-over-2000-coronavirus-cases ("Prison overcrowding has been quietly tolerated for decades. But the pandemic is forcing a reckoning.").

Drug offenders, including nonviolent offenders like Mr. Brown, have borne the brunt of this expanded and excessively punitive system. The Bureau of Justice Statistics reported in 2015 that "offenders whose most serious offense (as defined by the BOP) was a drug offense accounted for more than half (52%) of the federally sentenced prison population."[35] Today, drug offenses account for 46.2% of individuals serving a sentence in the Bureau of Prisons.[36] And the harsh sentencing of drug offenses has contributed to the broader growth of mass incarceration.

> [A] large portion of the growth in state and federal imprisonment is due to the increased number of arrests for drug offenses and the increased number of prison commitments per drug arrest. Law enforcement efforts targeting drug offenses expanded greatly after the 1970s, with the arrest rate for drugs increasing from about 200 per 100,000 adults in 1980 to more than 400 per 100,000 in 2009 (Snyder, 2011). Sentencing for drug offenses also became more punitive, as mandatory prison time for these offenses was widely adopted by the states through the 1980s and incorporated in the Federal Sentencing Guidelines in 1986.[37]

Yet the expansion of federal incarceration and harsh sentences was and is not grounded in the reality of crime prevention or our understanding of social problems. The National Research Council commented that:

> Social science evidence has had strikingly little influence on deliberations about sentencing policy over the past quarter century. Many factors combined to increase sentence lengths in U.S. prisons. They include enactment of mandatory minimum sentence, truth-in-sentencing, three strikes, and life without possibility of parole laws; discretionary decisions by prosecutors to charge and bargain more aggressively and by judges to impose longer sentences; and decisions by parole boards to hold many prisoners longer, deny discretionary release altogether more often, and revoke parole more often. Some of these decisions were premised on beliefs or assumptions about deterrence, incapacitation, or both. From a crime control perspective, those beliefs and assumptions were largely mistaken…[38]

Indeed, empirical studies have shown that there is little evidence for a correlation between longer imprisonment and improved public safety. A 2012 study by the Pew Center on the States concluded that:

---

[35] Bureau of Justice Statistics, Special Report: Drug Offenders in Federal Prison: Estimates of Characteristics Based on Linked Data, 2015.

[36] *See* https://www.bop.gov/about/statistics/statistics_inmate_offenses.jsp (last updated Sept. 5, 2020).

[37] *The Growth of Incarceration in the United States: Exploring Causes and Consequences.* 2014. Washington, DC: The National Academies Press, at 152.

[38] *Id.* at 89. In 2014, the National Research Council concluded that "[t]he growth in incarceration rates in the United States over the past 40 years is historically unprecedented and internationally unique," noting that "close to 25 percent of the world's prisoners were held in American prisons, although the United States accounts for about 5 percent of the world's population." *The Growth of Incarceration in the United States: Exploring Causes and Consequences.* 2014. Washington, DC: The National Academies Press, page 2. The NRC's recommendation was clear: "Given the small crime prevention effects of long prison sentences and the possibly high financial, social, and human costs of incarceration, federal and state policy makers should revise current criminal justice policies to significantly reduce the rate of incarceration in the United States." *Id.* at 9.

[d]espite the strong pattern of increasing length of stay, the relationship between time served in prison and public safety has proven to be complicated. For a substantial number of offenders, there is little or no evidence that keeping them locked up longer prevents additional crime.[39]

"Research clearly shows there is little return on public dollars for locking up low-risk offenders for increasingly long periods of time and, in the case of certain non-violent offenders, there is little return on locking them up at all."[40] The *Pew Report* also states that "a 2006 legislative analysis in Washington State found that while incarcerating violent offenders provides a net public benefit by saving the state more than it costs, imprisonment of property and drug offenders leads to negative returns.[]"[41]

The Second Circuit, SDNY and EDNY figures since *Booker* reflect the reality of reflexively long Guidelines sentences. As Judge Gleeson has noted in his academic writing, "the federal prison population has exploded under the Guidelines, and the average sentence lengths have increased dramatically."[42] Strict Guideline calculations do not represent a sentence "sufficient, but not greater than necessary" to accomplish the objectives of sentencing with respect to Mr. Brown. *See also United States v. Vega*, 545 F.3d 743 (9th Cir. 2008) ("We agree with the Seventh Circuit that the imposition of ... community service conditions will further the statutory goal of providing 'the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.' ... [C]ommunity service is another opportunity for a defendant to obtain education and vocational training.") (quoting 18 U.S.C. § 3553(a)(2)(D)).

That prisons are not the most effective venues for rehabilitation is not controversial. *See McClary v. Kelly*, 4 F.Supp.2d 195, 207 (W.D.N.Y. 1998) ("a conclusion… that prolonged isolation from social and environmental stimulation increases the risk of developing mental illness does not strike this court as rocket science. Social science and clinical literature have consistently reported that when human beings are subjected to social isolation and reduced environmental stimulation, they may deteriorate mentally and in some cases develop psychiatric disturbances (citing cases)."). *See also* Chairman Paul Ryan, House Budget Committee Majority Staff, *Expanding Opportunity in America: A Discussion Draft from the House Budget Committee* (July 24, 2014), at 56 (quoting Justice Fellowship) ("Rather than encouraging criminals to become peaceful, productive citizens, prison culture often has the opposite effect, operating as a graduate school for crime.")[43]; *Unlocking America: Why and How to Reduce America's Prison Population*, The JFA Institute (Nov. 2007), at 10[44] ("Enduring separation from family and community—deprived of material possessions, subjected to high levels of noise and artificial

---

[39] *Time Served—The High Cost, Low Return of Longer Prison Terms*, The Pew Center on the States (June 2012), https://www.pewtrusts.org/-/media/assets/2012/06/06/time_served_report.pdf (hereinafter the "Pew Report"), at 4.
[40] *Id.* at 5.
[41] *Id.* at 8 (footnote omitted).
[42] Gleeson, *Sentencing Commission and Prosecutorial Discretion*, 36 Hofstra L. Rev. at 657. In *United States v. Dossie*, Judge Gleeson rued that "I have seen far too many young people lose their claim to a future by committing non-violent drug crimes." No. 11-CR-237 (JG), 2012 WL 1086516, at *10 (E.D.N.Y. Mar. 30, 2012).
[43] This can be found at https://time.com/wp-content/uploads/2014/12/expanding_opportunity_in_america.pdf and at http://www.justicefellowship.org/criminal-sentencing.
[44] This can be found at http://www.jfa-associates.com/publications/srs/UnlockingAmerica.pdf.

light, crowded conditions and/or solitary confinement, devoid of privacy, with reduced options, arbitrary control, disrespect, and economic exploitation—is maddening and profoundly deleterious. Anger, frustration, and a burning sense of injustice, coupled with the crippling processes inherent in imprisonment significantly reduce, the likelihood that prisoners are able to pursue a viable relatively conventional life after release.").

"[I]mprisonment is not an appropriate means of promoting correction or rehabilitation." 18 U.S.C. § 3582(a). *See United States v. Rosado*, 254 F.Supp. 2d 316, 321 (S.D.N.Y. 2003) ("Since rehabilitation may not be a basis for incarceration but must be considered as a basis for sentencing, Congress must have anticipated that sentencing judges would use their authority, in appropriate cases, to reduce a defendant's sentence to permit him to continue his rehabilitation in the most effective manner."). Rehabilitation is also a goal of punishment. *See* 18 U.S.C. § 3553(a)(2)(D).

According to a 2016 editorial published in the New York Times by Jason Furman, chairman of the White House Council of Economic Advisors, and former Congressional Budget Office director Douglas Holtz-Eakin, "[a] growing body of research shows that incarceration and longer sentences could increase recidivism. Individuals may build criminal ties while incarcerated, lose their labor-market skills and confront substantial obstacles to re-entry after release. A new study finds that each additional year of incarceration increases the likelihood of re-offending by four to seven percentage points after release. The bottom line: The putative benefits of more incarceration or longer sentences are actually costs."[45]

The problem of mass incarceration is also about the draconian length of sentences. "[W]e should begin by focusing on the 'low-hanging fruit' — the nonserious, nonviolent, nonsexual offenders — until we have a better idea of what works in criminal justice reform. But we already know now what works. The evidence is clear. People age out of crime. Lengthy sentences do not reduce crime. It is the certainty of punishment not the severity of punishment that has the greatest crime reduction effects."[46] *See United States v. Bannister*, 786 F.Supp.2d 617 (E.D.N.Y. 2011) ("The increased prison population is due in large part to longer sentences. For the same crimes, American prisoners receive sentences twice as long as English prisoners, three times as long as Canadian prisoners, four times as long as Dutch prisoners, five to 10 times as long as French prisoners, and five times as long as Swedish prisoners. Yet these countries' rates of violent crime are lower than ours, and their rates of property crime are comparable.").

There is now a growing chorus that, as Justice Kennedy stated, "our punishments [are] too severe, our sentences too long."[47] Justice Kennedy cautioned us not to fear mercy: "A

---

[45] Jason Furman and Douglas Holtz-Eakin, Editorial, *Why Mass Incarceration Doesn't Pay*, THE NEW YORK TIMES, April 21, 2016, p. A29, available at https://www.nytimes.com/2016/04/21/opinion/why-mass-incarceration-doesnt-pay.html.

[46] Daniel Denvir, *"Nonserious, non-violent, non-sexual": Fixing our mass incarceration problem means getting past the easy steps,* SALON, October 26, 2015, available at http://www.salon.com/2015/10/26/non_serious_non_violent_non_sexual_fixing_our_mass_incarceration_problem_means_getting_past_the_easy_steps/.

[47] Justice Anthony M. Kennedy, Address at the American Bar Association Annual Meeting, San Francisco, Ca. (Aug. 9, 2003), *available at* http:// meetngs.abanet.org/webupload/commupload/ CR209800/newsletterpubs/Justice_Kennedy_ABA_Speech_Final.pdf.

country which is secure in its institutions, confident in its laws should not be ashamed of the concept of mercy. As the greatest of poets has said 'mercy is the mightiest in the mightiest. It becomes the throned monarch better than his crown.'"[48]

"The fundamental and most powerful reform that must occur if we are to have any hope of reversing the imprisonment binge, is to reduce the severity of the sentences that are given. For many prisoners now sent to prison, this would mean probation or a short jail sentence; for others, it would mean less time spent in prison, as well as less time on parole."[49] "Despite a sharp national decline in crime, American criminal justice has become crueler and less caring than it has been at any other time in our modern history..."[50] "The makers of the sentencing guidelines succeeded only in contributing to the making of a law of punishment that shows obstinately *little* concern for the personhood of offenders...a law that tends to treat offenders as something closer to animals than humans, and that has correspondingly sought, more and more frequently, simply to lock them away."[51]

There has been very little empirical evidence to show that higher sentences promote the overarching goal of the sentencing guidelines, which is to prevent drug trafficking. One striking example is with the price of drugs. While it is thought that increased enforcement and removing sellers from the street increases prices, and thus reduces demand, "[t]here is surprisingly little evidence that additional enforcement of any kind, at the margin, appreciably raises drug prices. The striking decline in US street cocaine and heroin prices (adjusted for purity) between 1980 and 2005—a period in which incarceration risk rose by perhaps an order of magnitude—provides the most troubling data-point."[52]

A "tough on crime" approach, with long sentences, is not effective in preventing overdoses either. As *Vox* reported in 2017:

> There's a simple logic to this: America has been deploying 'tough on crime' policies for decades, yet that didn't prevent the deadliest drug overdose epidemic in the country's history. The drug war policies were supposed to crack down on the supply of drugs by pushing out sellers, therefore making the substances more expensive and, as a result, less accessible. But since 1981, the price of heroin per pure gram has actually dropped by more than 85 percent.
>
> . . .

[48] *Id.*

[49] *Unlocking America: Why and How to Reduce America's Prison Population*, The JFA Institute (Nov. 2007), at 23, available at http://www.jfa-associates.com/publications/srs/UnlockingAmerica.pdf.

[50] Glenn C. Loury, *Why are so many Americans in Prison?*, Boston Review (July 1, 2007), available at http://bostonreview.net/loury-why-are-so-are-americans-in-prison.

[51] James Q. Whitman, *Harsh Justice: Criminal Punishment and the Widening Divide Between America and Europe* (2003), p. 223, n. 72 (emphasis in original).

[52] Harold A. Pollack and Peter Reuter, "Does tougher enforcement make drugs more expensive?" *Society for the Study of Addiction* (2014), https://reuter.it-prod-webhosting.aws.umd.edu/sites/default/files/reuter/files/pollack_and_reuter.pdf, at 2.

"Expecting that you're going to change the behaviors of the retailers with those sentences is just cognitively unrealistic with the way we fallible mortals process benefits and consequences and make decisions," [Jon] Caulkins[, a drug policy expert at Carnegie Mellon University,] said. "It's symbolic at some level; it's an expression of our outrage and frustration. It's not very practical."

To the extent these laws do at least remove drug traffickers from the streets, those dealers are merely replaced with others — so there isn't even a significant incapacitation effect. A 2009 review of the research by the RKC Group, funded by the Colorado Criminal Justice Reform Coalition, backed this up. It concluded, "Simply put, the market responds to the demand for drugs by replacing drug sellers sent to prison with either new recruits or by the increased drug selling of dealers already in the market. As a result, the incapacitation effect found for some other offenses is largely nullified in the case of drug dealing."[53]

The collateral consequences of this conviction are significant, and Mr. Brown will be prevented from community assistance as a result of his conviction. In *Bannister*, Judge Weinstein recognized that "[b]eyond separating convicts from their families and the work force, incarceration imposes numerous collateral consequences." 786 F. Supp.2d at 653. Among those "imposed by law include 'ineligibility for federal welfare benefits, public housing, student loans, and employment opportunities, as well as various forms of civic exclusion, such as ineligibility for jury service and felon disenfranchisement.'" *Id.* at 654 (quoting Michael Pinard, *Collateral Consequences of Criminal Convictions: Confronting Issues of Race and Dignity*, 85 N.Y.U. L. Rev. 457, 459 (2010)). Mr. Brown will have to work that much harder in order to ensure that he does not need these benefits.

In addition to those consequences, the time he has spent on supervised release, and the additional years of supervised release he faces, is a sufficient punishment and deterrent for Mr. Brown not to commit additional crimes and to be held accountable for his conduct in this case.

III. *This District and Circuit Routinely Sentence Well Below Guidelines*

Furthermore, sentencing statistics show that the Guidelines are no longer the predominant factor in the majority of sentences in the Southern District of New York, the Eastern District of New York, or the Second Circuit. The USSC publishes preliminary abstracts of federal sentencing statistics for each quarter of the fiscal year. At the end of the fiscal year, the Sentencing Commission publishes a final cumulative report, the *USSC Final Quarterly Sentencing Update*,[54] as well as reports examining federal sentencing statistics from each judicial district and circuit.[55] The most recent available report for the Second Circuit is the *USSC Statistical Information Packet Fiscal Year 2019 Second Circuit*, which covers sentences imposed

---

[53] German Lopez, "The New War On Drugs," *Vox* (Sept. 13, 2017), https://www.vox.com/policy-and-politics/2017/9/5/16135848/drug-war-opioid-epidemic.

[54] *See* https://www.ussc.gov/research/data-reports/quarter/quarterly-sentencing-updates.

[55] *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2019/2c19.pdf.

from October 1, 2018 through September 30, 2019.[56] This report shows that within the Second Circuit, a clear majority of sentences, 67.3%, were *below* the calculated Guidelines range, with 41.3% non-Government sponsored below range.[57] In the Southern District of New York, a clear majority of sentences are not just below-guidelines, but non-government sponsored below guidelines: 54.2% (74.5% of sentences total were below the Guidelines range).[58] 70.7% of EDNY sentences were below range, with 43.7% non-government sponsored below range sentences.[59]

In addition, only a minute fraction, 2.6%, of all EDNY sentences were above the Guidelines range.[60] In SDNY, this was even smaller, at 0.6%.[61] As discussed, the reasons for sentences below the Guidelines have evolved as well. In EDNY, 27.0% of sentences were below-Guidelines as a result of government-sponsored motions, while a much bigger proportion, 43.7%, were below-Guidelines and not government sponsored.[62] Also, nationally, the proportion of §3553(a)-based below-Guidelines sentences relative to government-sponsored below-Guidelines sentences has increased dramatically since *Booker*.[63]

For drug trafficking offenses, the data for the Eastern and Southern Districts are also instructive. Only 15.5% of drug-trafficking sentences in SDNY, and 18.5% in EDNY, were within the Guidelines range in Fiscal Year 2019, while at least 83.0% in SDNY, and as much as 81.6% in EDNY, were below the Guidelines.[64] Per the USSC's *Statistical Information Packet* for Fiscal Year 2017, when it last reported more detailed data regarding the bases for above- and below-Guidelines sentences, over 86% of drug-trafficking sentences in EDNY in fiscal year

---

[56] *See USSC Statistical Information Packet Fiscal Year 2019 Second Circuit*, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2019/2c19.pdf.

[57] *See id.* at 12.

[58] *See USSC Statistical Information Packet Fiscal Year 2019 Southern District of New York*, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2019/nys19.pdf (hereinafter "SDNY Statistical Information Packet"), at 12.

[59] *See USSC Statistical Information Packet Fiscal Year 2019 Eastern District of New York*, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2019/nys19.pdf (hereinafter "EDNY Statistical Information Packet"), at 12.

[60] *See* EDNY Statistical Information Packet at 12.

[61] *See* SDNY Statistical Information Packet at 12.

[62] *See* EDNY Statistical Information Packet at 12.

[63] *Compare USSC Final Quarterly Data Report*, Fiscal Year 2017, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC-2017_Quarterly_Report_Final.pdf, at 11. with *USSC Final Quarterly Data Report*, Fiscal Year 2006, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC_2006_Quarter_Report_Final.pdf, at 1.

[64] *See* SDNY Statistical Information Packet at 16; EDNY Statistical Information Packet at 16. These reports for Fiscal Year 2019, unlike the reports for Fiscal Year 2017, provide only the total percentage of drug-trafficking sentences that were a variance from the Guidelines; they do not specify which portion of that percentage were upward or downward variances.

2017 were below the Guidelines, and *46.2%* were below-Guidelines with *Booker* / 3553(a) factors alone.[65] In SDNY, these numbers were 84% and *57.6%*, respectively.[66]

Moreover, of the 4,318 sentences meted out for drug trafficking nationally during the Final Fiscal Year 2017 *Quarterly Sentencing Update* period (October 1, 2016 through September 30, 2017), that were non-government sponsored below Guidelines, the *median* sentence was 48 months, representing a 20-month *median* decrease from the Guideline minimum (or a 31.4% "*median* percent decrease from Guideline minimum").[67] Nationally, average drug-trafficking and manufacturing sentences have remained approximately 20 months below the applicable Guideline minimum during the last 7 years.[68]

Thus, any support for a Guidelines sentence for Mr. Brown in this case not only ignores all §3553(a) factors other than the Guidelines, but also defies the standard in this district and in this country. In this case, the Guidelines simply do not reflect a sentence "sufficient but not greater than necessary."

## Conclusion

"Additional months in prison are not simply just numbers. Those months have exceptionally severe consequences for the incarcerated individual. They also have consequences both for society which bears the direct and indirect costs of incarceration and for the administration of justice which must be at its best when [] the stakes are at their highest." *United States v. Jenkins*, 854 F.3d 181, 192 (2d Cir. 2017).

Allowing Mr. Brown to continue in the community, where he has maintained employment despite his arrest and the pandemic, ensures that he and those he cares for will have successful outcomes in the future. And he has already received, and will continue to be impacted by, the consequences of his sentence in this case, even without a further lengthy incarceration. Mr. Brown is now faced with a felony criminal record, consequences that will follow him for the rest of his life. He has had to start over, in the middle of a pandemic, in order to continue to support himself and his family.

Mr. Brown's goal is to repair his credit, regain his savings, and buy a home down south, where prices are more affordable, for his entire family. He has been speaking with a loan specialist to learn what he needs to do to be able to find a home so his family will have the security that has eluded them since they lost so much in the last three years. Mr. Brown

---

[65] *See USSC Statistical Information Packet Fiscal Year 2017 Eastern District of New York*, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2017/nye17.pdf, at 18-19.
[66] *See USSC Statistical Information Packet Fiscal Year 2017 Southern District of New York*, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2017/nys17.pdf, at 18-19.
[67] *See USSC Final Quarterly Data Report*, Fiscal Year 2017, Table 17 at 26 (emphasis added). I rely on 2017 statistics here because the USSC has not provided data for these specific measures since its fiscal year 2017 report.
[68] *See USSC Final Quarterly Data Report*, Fiscal Year 2019, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC-2019_Quarterly_Report_Final.pdf, Figure 10 at 33; *USSC Final Quarterly Data Report*, Fiscal Year 2017, Figure J at 33.

maintains the same commitment to family that has defined him. Putting him in jail would set him further back, and destabilize his entire family at a time when their own health, as well as the nation, is in crisis. Mr. Brown remains the most viable source of support for multiple generations in his family. His commitment to them is heartwarming and something to support.

For the reasons set forth above, it is respectfully requested that William Brown be sentenced to time served and a period of supervised release as determined by the Court. Mr. Brown and his family are grateful for the Court's consideration of mercy.

Sincerely,

Susan K. Marcus, Esq.